UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:07-CV-52-M

JAMES C. PATTERSON                                                                                  PLAINTIFF

V.

CITY OF EARLINGTON, et al.                                                                    DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment on Plaintiff's claims for violation of the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, for violation of the Kentucky Whistleblower Act (KRS § 61.102 *et seq.*), and for intentional infliction of emotional distress. Fully briefed, the matter is ripe for decision. For the reasons that follow, Defendants' motion is **GRANTED**.

### I. BACKGROUND

In November 2006, Michael Seiber was elected mayor of the City of Earlington, Kentucky. Around this time, James "Craig" Patterson, the city's chief of police, began to hear "grumblings or comments" that Seiber may not have met the residency requirement for mayoral candidates. (Patterson Deposition, p. 48). He consulted with Paul Rhodes, a former city employee, and with Steve Everly, the then-outgoing mayor of Earlington, and they advised him that candidates for mayor were required to have resided within the city

1

limits for one year "immediately preceding" the election.  As a result, Patterson began gathering Seiber's election-related filings from the Hopkins County Clerk's Office, as well as records of his water usage from the City's Water Department, to determine whether he resided in Earlington for the requisite time.  Patterson's search revealed that Seiber had listed multiple addresses as his legal residence prior to the November 2006 election, and that one such address pertained to a vacant lot.

On January 1, 2007, Seiber officially took office.  That day, he met with Patterson to announce his intention to switch the mayor's office with a larger room that was then occupied by the police department.  Patterson objected to the move.  However, Seiber reportedly dismissed Patterson's concerns and told him that the move needed to happen by Friday of that week.  On Thursday, January 4, 2007, Patterson, along with Everly and Rhodes, met with Detective Stacey Blackburn of the Kentucky State Police and presented him with a letter detailing the results of Patterson's investigation of Seiber's alleged election law violations.  Patterson also told Blackburn about Seiber's proposed room switch and his concern that police evidence lockers would be moved without proper supervision.

Blackburn relayed this information to Captain Leslie Gannon.  She, in turn, wrote a letter to Seiber notifying him that an official complaint had been filed against him and that "until you are contacted by the investigating officer, you are hereby advised not to tamper with any police evidence that is located in the city building." [DN 38, Exhibit 4].  Blackburn delivered the letter to Seiber later that day.  Seiber recalls telling Blackburn, "I

know what this is about. I moved the police department." (Seiber Deposition, p. 73). However, Blackburn recalls Seiber responding to the letter by saying, "This is all about Craig Patterson." (Blackburn Deposition, p. 88). Ronnie Cox also had a conversation with Seiber that week in which "[Seiber] was upset . . . [and] said something about [how] Craig [Patterson] had an investigation about his residency in Earlington." (Ronnie Cox Deposition, p. 37).

On January 5, 2007, Patterson went to the city building to pick up his paycheck and was told that he needed to speak with Seiber. They met, and Seiber reportedly asked him to resign, but Patterson refused. Seiber then handed him an envelope saying, "I don't have any choice. It's nothing personal. I don't have the money to pay you." (Patterson Deposition, p. 104). Patterson abruptly left the office. A short while later, he opened the envelope and found a letter dated January 4, 2007, which read: "This letter is a formal notice of your removal as Earlington chief of police, effective immediately (KRS 83A.080), due to lack of revenue to maintain a two-person police department." [DN 38, Exhibit 13].

## II. STANDARD OF REVIEW

To grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the

absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

### III. DISCUSSION

Defendants argue that Plaintiff's claims should be dismissed because (1) the record shows that he did not speak "as a citizen" for purposes of his First Amendment claim when he approached the state police about Seiber's alleged violations of Kentucky law; (2) his Equal Protection claim is based on a "class of one" theory, which the United States Supreme Court has found noncognizable in the public employment context; (3) his Kentucky Whistleblower Act claim fails because the City of Earlington is not an "employer" for purposes of the Act; and (4) Kentucky case law holds that a plaintiff's termination, even if discriminatory, does not rise to the level of "outrageous conduct"

4

necessary to establish liability for intentional infliction of emotional distress. The Court considers these arguments in turn.

### A. Federal Law Claims

Plaintiff's federal law claims are brought pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must demonstrate that "(1) the defendants deprived him of a right, privilege, or immunity secured to [him] by the United States Constitution or other federal law; and (2) the defendants caused the deprivation while acting under color of state law." Gregory v. Shelby County, Tenn., 220 F.3d 433, 441 (6th Cir. 2000). Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." Alexander v. Haymon, 254 F.Supp.2d 820, 830 (S.D. Ohio 2003) (quoting Gardenhire v. Schubert, 205 F.3d 303, 310 (6th Cir. 2000)) (internal marks omitted)). At issue here are Patterson's substantive rights under the First and Fourteenth Amendments to the United States Constitution.

### 1. First Amendment

Patterson's First Amendment claim is based on the idea that he was retaliated against for constitutionally-protected speech, i.e., for reporting Seiber's alleged election law violations and possible interference with police evidence to the Kentucky State Police. In order to state a prima facie case of retaliation under the First Amendment, a plaintiff must show that: "1) he engaged in constitutionally protected speech; 2) he was subjected to adverse action or was deprived of some benefit; and 3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action." Leary v. Daeschner,

349 F.3d 888, 897 (6th Cir. 2003). Whether a public-employee plaintiff engages in constitutionally protected speech depends on whether he is speaking as a citizen on a matter of public concern, and whether his interest in so speaking outweighs the State's interest in promoting effective and efficient public service. Pickering v. Bd. of Educ. Of Township High School Dist., 391 U.S. 563, 568 (1968); Connick v. Myers, 461 U.S. 138, 147 (1983); see also Kindle v. City of Jeffersontown, 2009 WL 69231 (W.D. Ky. 2009). If the answer to both inquiries is yes, the speech is protected.

      The Court has little doubt that Patterson spoke on a matter of public concern when he met with the Kentucky State Police. See Solomon v. Royal Oak Township, 842 F.2d 862, 865 (6th Cir. 1988) (finding that "speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection.") (citations omitted); see also Connick, 461 U.S. at 148 (explaining that statements "seek[ing] to bring to light actual or potential wrongdoing or breach of public trust on the part of [government employees]" address a matter of public concern). The question is whether he was speaking "as a citizen." In Garcetti v. Ceballos, 547 U.S. 410 (2006), the Supreme Court explained that public employees do not "surrender all their First Amendment rights by reason of their employment." Id. at 417; see also Thomas v. Whalen, 51 F.3d 1285, 1291 (6th Cir. 1995) (noting that "[f]reedom of speech is not traded for an officer's badge . . .") (quotation omitted). However, it made clear that "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications

from employer discipline." Garcetti, 547 at 421.

This means that if Patterson's statements to the Kentucky State Police were made "pursuant to [his] official duties" as the City of Earlington's chief of police, then he was not speaking "as a citizen" and his speech is not protected by the First Amendment. Id. The Supreme Court has "had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," but it has explained that "the inquiry is a practical one" and that courts should focus on "the duties an employee actually is expected to perform." Id. at 424-25; see, e.g., Barachkov v. 41B Dist. Court, 311 Fed. Appx. 863, 871 (6th Cir. 2009) (finding that interview statements were not made "as a citizen" because the employees "participated in the interviews, and produced the speech in question, at the behest of their employer and as part of their professional responsibilities."); Haynes v. City of Circleville, Ohio, 474 F.3d 357, 364 (6th Cir. 2007) (finding that a police officer's memorandum was not protected speech where it concerned his official duties and was addressed to his supervisor).

Plaintiff argues that he spoke to the Kentucky State Police "as a citizen" and directs the Court to Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006) and Kindle v. City of Jeffersontown, 2009 WL 69231 (W.D. Ky. 2009). In Freitag, a female corrections officer submitted a formal complaint to the California Department of Fair Employment and Housing and California State Senator Richard Polanco alleging sexual harassment by inmates at the facility and harassment by her supervisors creating a hostile work

environment. At trial, a jury rendered a verdict in her favor. The Ninth Circuit affirmed on appeal. It held that the plaintiff's communications were protected by the First Amendment because they were not part of her job duties and "[h]er right to complain both to an elected official and to an independent state agency is guaranteed to any citizen . . . . [and her letters] 'bore similarities to letters submitted by numerous citizens every day.'" Id. at 545.

In Kindle, the plaintiffs worked as a police officer and dispatchers for the Jeffersontown, Kentucky, Police Department. They submitted a document to the Jeffersontown Ethics Commission alleging that a lieutenant violated federal and state wage and hour laws and otherwise mismanaged the department, were fired, and brought suit for First Amendment retaliation under § 1983. The defendant argued that plaintiffs' speech was not protected by the First Amendment because they were speaking within the scope of their official duties as public employees. Judge Simpson disagreed. He held that the plaintiffs were speaking "as citizens" because "whistleblowing reportage" is not a part of a police officer's or dispatchers' job duties generally, and it was not a core responsibility of the plaintiffs' as employees of the Jeffersontown Police Department. Kindle, 2009 WL 69231, at *7.

Defendants argue that Cheek v. City of Edwardsville, 514 F.Supp.2d 1220 (D. Kansas 2007), *aff'd* 2008 WL 4150029 (10th Cir. 2008), and Mantle v. City of Country Club Hills, 2008 WL 3853432 (E.D. Mo. 2008) are more on point. In Cheek, two police officers brought First Amendment retaliation claims when they were dismissed after

8

talking with the Kansas Attorney General's Office about alleged violations of law by their police chief and other officials within city government. On a motion for summary judgment, the court found in favor of the City of Edwardsville. It reasoned that since plaintiffs were responsible for investigating criminal conduct, their communications with the Kansas Attorney General's Office about a criminal investigation of their employer was "speech ow[ing] its existence to activities that the City paid [them] to do" and thus not protected by the First Amendment.

Similarly, in Mantle, a police chief received complaints that the town's mayor had misappropriated government funds. He reported those allegations to a judge on the city's municipal court, who in turn reported the allegations to law enforcement authorities. The city's board of alderpersons subsequently voted to terminate the police chief's employment, and the police chief brought a § 1983 suit alleging retaliatory discharge for speech protected by the First Amendment. The United States District Court for the Eastern District of Missouri granted the city's motion for summary judgment. It found that the police chief's statements to the city's municipal court judge were made pursuant to his official duties because he had a duty to report criminal conduct and the judge "was simply the most appropriate authority to whom to make a report . . . " Mantle, 2008 WL 3853432, at *4. On appeal, the Tenth Circuit affirmed.

The Court finds the instant case most analogous to Cheek and Mantle. Here, Patterson began collecting Seiber's election-related filings from the Hopkins County Clerk's Office in his official capacity as Earlington's chief of police because of public

9

complaints; he uncovered evidence of Seiber's alleged criminal misconduct through an investigation; he had a duty to report that misconduct; and he in fact reported that misconduct to the Kentucky State Police because it was the "most appropriate authority" to "carry the investigation." <u>Mantle</u>, 2008 WL 3853432, at *4; (Patterson's Deposition, pp. 49, 51). As he says in his complaint:

> Both prior to and after the election of Defendant, Michael Seiber, to the office of Mayor of the City of Earlington, Kentucky, Plaintiff, James C. Patterson, **received complaints in his official capacity as Police Chief for the City of Earlington**, Kentucky from various citizens of the City of Earlington questioning whether Defendant Seiber met the statutorily imposed qualifications to hold the office of Mayor for the City of Earlington, Kentucky . . . .
>
> Based upon the above-referenced complaints, Plaintiff Patterson, **acting in his official capacity as Police Chief of the City of Earlington, Kentucky, began an investigation** into whether Defendant Seiber had engaged into any criminal activity in becoming a candidate for the office of Mayor for the City of Earlington, and/or whether Defendant Seiber otherwise met the residency requirements to lawfully hold the office of Mayor for Earlington, Kentucky . . . .
>
> Plaintiff Patterson's **investigation in his official capacity as the Police Chief of Earlington revealed sufficient evidence for Plaintiff Patterson to develop probable cause to believe that Defendant Seiber had committed various felony(s) and misdemeanor(s) crimes** in order to become a candidate for the office of Mayor of the City of Earlington, Kentucky.

(Plaintiff's Amended Complaint, ¶¶ 7-9) (emphasis added).

Plaintiff's present attempt to recharacterize his actions as those of "a concerned citizen" through the use of a post-motion-for-summary-judgment affidavit is unavailing. (Patterson Affidavit, p. 1-2). To the extent the statements in his affidavit actually conflict

10

with the statements in his deposition and amended complaint they are inadmissible, and the Court disregards them. See Hughes v. Vanderbilt University, 215 F.3d 543, 549 (6th Cir. 2000) ("Plaintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit."); Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc., 780 F.2d 549, 551 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.").

However, Patterson argues that many of the statements in his affidavit do not conflict with his earlier statements because he was only acting in his official capacity up until the time he wrote the letter and met with the Kentucky State Police—at which point he was no longer acting as a police officer but as a concerned citizen. He emphasizes that he had the support and cooperation of citizens Everly and Rhodes, drafted the letter "on Patterson's home computer rather than at work," drove in his personal vehicle to meet with the Kentucky State Police, and did not wear his uniform to the meeting. (Plaintiff's Response, p. 13). He also notes that his investigation did not follow the normal procedures, i.e., he did not "get a SRN number" for the inquiry and he kept the folder "with what [he] collected" about Seiber "with [him]" rather than in his office. (Patterson Deposition, pp. 42, 148); (Plaintiff's Amended Complaint, ¶¶ 7-9). The Court finds these arguments unconvincing.

Given that Patterson had previously "received" and "investigated" the community complaints in his "official capacity," and given that he had a duty to report criminal

11

misconduct as Earlington's chief of police, the Court finds it implausible that Patterson spoke "as a citizen" when he reported Seiber's alleged criminal misconduct to the state police. (Plaintiff's Amended Complaint, ¶¶ 7-9); Earlington Code, § 34.02 (explaining that "the Chief of Police shall be a peace officer and responsible for the . . . enforcement of all statutes, laws, and ordinances thereof."); cf. Garner v. City of Cuyahoga Falls, 311 Fed. Appx. 896, 901-902 (6th Cir. 2009) (rejecting a similar argument where plaintiff's later speech allegedly made as a citizen "emanated directly from his [earlier, professional] role and responsibility").  His clothing, companions, and alleged civic motive aside, Patterson's report of Seiber's alleged criminal misconduct to the Kentucky State Police was necessarily speech "pursuant to [his] official duties" because it was something he was "actually . . . expected to perform." Garcetti, 547 at 421, 424-25.  The Court therefore holds that Patterson's speech to the Kentucky State Police is not entitled to First Amendment protection.

    2. Equal Protection

Defendants also argue that Plaintiff's Equal Protection claim should be dismissed because it is a "class of one" claim by a public employee which the Supreme Court categorically rejected in Engquist v. Or. Dep't of Agric., ___ U.S. ___, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008).  Plaintiff, for his part, contends that Engquist does not control because that case involved an "at-will" public employee and this case does not since Patterson could not be fired without the "approval" of the city council.  Defendant rejoins that the City of Earlington ordinance § 34.02(C) indicates that Patterson could be

fired without the approval of the city council and thus he was an "at-will" employee. The Court finds these latter arguments somewhat off target, but it nonetheless agrees with Defendants that Engquist precludes the claim.

There are two reasons why Plaintiff's "class of one" claim fails under Engquist. First, the Supreme Court made no distinction between "at-will" and "non-at-will" employees. All it said was that allowing a "class of one" equal protection claim to go forward in the public employment context would be "contrary to the concept of at-will employment." Id. at 2151. It immediately noted, however, that most public employment is no longer "at-will," and it broadly concluded that "the class-of-one theory of equal protection has *no application in the public employment context*." Id. at 2156 (emphasis added). This conclusion was "guided" not by any distinction between "at-will" and "non-at-will" employment, but by the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." Id. (quoting Connick v. Myers, 461 U.S. 138, 143 (1983)); see Bowman v. Burroughs, 2008 WL 5427910, *16, n. 18 (W.D. Pa. 2008) (finding that "there is nothing in Engquist, which suggests that the rule established in that case is limited to at-will employment situations."). The Court therefore concludes that Engquist applies equally to all public employment "class of one" claims.

Even if Engquist were read as narrowly as Plaintiff suggests, however, it would still foreclose his claim here. The relevant Kentucky employment statute provides that "[Nonelected city] officers may be removed by the executive authority at will unless

13

otherwise provided by statute or ordinance." KRS § 83A.080(3). Patterson argues that Earlington ordinance § 34.02(C) "otherwise provides" because it says that "[t]he Police Chief and all police officers shall be appointed by the Mayor, with the approval of the City Council, and may be removed by the Mayor, *with the approval of the City Council*, except as tenure and terms of employment are protected by statute, ordinance, or contract." Id. (emphasis added). To a certain extent he is clearly right: Earlington ordinance § 34.02(C) modifies KRS § 83A.080(3) by requiring "approval" of the city council in order for the mayor to remove police officers, including the chief of police. However, Patterson is wrong to conclude that this makes him anything other than an "at-will" employee. "The basic principle of at-will employment is that an employee may be terminated for a good reason, bad reason, or no reason at all." Engquist, 128 S.Ct. at 2155 (quotation omitted). The fact that the city council's approval is required before the mayor can terminate the chief of police's employment does not, as Plaintiff would have it, convert his "at-will" position into one that is only terminable "for cause"—it simply indicates whose will matters. Accordingly, the Court finds that summary judgment for Defendants on Plaintiff's Equal Protection claim is appropriate.

    B. State Law Claims

Having dismissed the Plaintiff's federal law claims, the Court declines to exercise pendent jurisdiction over Plaintiff's state law claims. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as

well."); see also Mitroff v. Xomox Corp., 797 F.2d 271, 278 (6th Cir. 1986) (explaining that "[t]he exercise of jurisdiction over pendent state claims is discretionary with the district court.").

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED**. Plaintiff's federal claims are dismissed with prejudice. His state law claims are dismissed without prejudice. A judgment will be entered consistent with this Opinion.

cc. Counsel of Record